219-0877-WC, Rock Solid Stabilization and Reclamation, Inc. Appellant v. The Workers' Compensation Commission, David Drips and Supermix Appellees. Okay, Mr. Campbell, you may proceed. Thank you, Your Honor. May it please the Court, my name is John Campbell. I represent Rock Solid, the appellant in this case. Rock Solid is one of two named respondents, and this is an issue over lending and borrowing between the other named employer, Supermix. You'll note that David Drips, the injured workers' attorney, is not part of this because the accident itself was not really in dispute. It's a question of liability between two named employers in this case. Where did the commission go wrong, Mr. Campbell? Well, I think the commission, as well as circuit court, in explaining the basis of their decision, has a few errors here that are worthy of your attention, and frankly, faulty conclusions of fact that warrant a reversal here. I'll name a few here. In citing the circuit court, one of the glaring errors I noticed was a finding that the hours worked by Mr. Drips were the same as the workers for my client, for Rock Solid. That's not true. Mr. Campbell, can I ask you a question? Yes. Do we even care what the circuit court said? Well, only because I want to highlight their error, so you have a basis to reverse, because I realize my standard is a challenging one at Manifest Weight, so I'm concerned that you simply... Excuse me. We examine the decision of the commission, not the circuit court. We only affirm or reverse its judgment. We don't care what its reasoning is. Okay. I understand. I think they were quite similar, and I will focus on the commission ruling. Two really glaring points that I think the commission made, and actually in absence of a lot of facts, that the commission failed to consider, and some of them being, as I was saying, the hours worked are not the same between Rock Solid and the drivers, all the drivers, including Mr. Drips. My client, Jonathan Pease, made clear that he was responsible for working on the job site. All of these cement drivers were responsible for hauling over the road and delivering product to the customer, Rachel. My client is not in that equation at all. That's an error. The finding that there was... Mr. Campbell, let me just interject an important threshold question. Yes. Who directed, or who allowed the claimants, or how did he receive his daily dispatch orders the night before? Wasn't it from a Rock Solid employee who was... Yes. Often, often it was. Jonathan Pease, my client, said that he would make the phone call himself, not always, but often, and I'm not hiding that fact, your honor, but let's look at, was it direction in control from him, or is he coordinating at the direction of Rachel, the general contractor? That was not addressed by the commission at all. I think they painted with a broad brush here. Jonathan Pease testified clearly, and the contract of work backs it up, that Rachel is the general contractor. Rachel bought all of this cement. Rachel paid all of the trucking companies and truckers to haul that cement. Yeah, but we're talking about supervising and control and direction. He followed the Rock Solid drivers, as I understand it, to the site. There were no SuperMix employees present on the work site, were they? No, no SuperMix employees were there, and there's no work done at the job site by Mr. Dripps, which I think is another error of the commission, saying that there's supervision and control by my client, who's at a job site hundreds of miles away from an accident, and someone's driving a truck. That doesn't really make any sense. There's no supervisor of any trucking company at the customer's location. Daily basis, he received his directions from the Rock Solid employees, not his company, correct? Yes, and I think that's exactly like what the Hastings case explained, was a distinction that's important in this case, which has to do with coordination between subcontractors and cooperating with work, and who's really in charge of direction and control. On that topic, was Rock Solid able to, did they have any power or authority to discipline him at all, or fire him, or do anything like that? Not at all, zero. Well, then that weighs against your position. No, Rock Solid did not have control. I think if you were asking about SuperMix, perhaps, I represent Rock Solid, and they did not. The testimony of Jonathan Pease was he did not have any exercise of discipline or control over the workers. He testified to it. So did Jack Pease, the owner of SuperMix, by the way, the direct employer. He testified the same way, and said, I don't give my son, this is a father and son situation, with regard to SuperMix and Rock Solid. They own the respective companies. So my son doesn't have control over my workers. Are you aware of the A.J. Johnson case? Yes, I am. Absolutely. So how is this case distinguishable from that case? Two ways. One, and I had turned repeatedly to the issue of money, and who pays who for what work, and we had to commission, and my opponent respectfully arguing that it doesn't matter. Money always matters. And the courts have declared that determining who's in control, one of the elements is who pays for what services. And A.J. Johnson, they bought a tremendous amount of asphalt from Del Mar. I believe it was the named asphalt provider. And they bought so much that Del Mar said, I'm going to throw in a truck to lay it and the workers. And they were working directly on the job site under A.J. Johnson's control. There was only one worker, Mr. Campbell, the operator of the asphalt laying machine. Right. It was the worker to control the machine that Del Mar offered because of the amount that was purchased. So that was offered on a job site, day to day. Again, that would be the same hours, that would be under direct control for the job being done. Not over the road trucking, hundreds of miles away where no money is exchanged between my client and his father's company, Supermix, or is he making any kind of a brokerage deal with Rachel, a general contractor? Both Jonathan Pease said there's a superintendent from Rachel on that job site controlling the pace, the schedule and the timing of everything. Rachel is in control of this job. It's undisputed. Undisputed. The contract itself says that in so many words. The contract for the entire job says Rachel is in charge of the pace. Rachel is in charge of hiring all the subs. And in fact, they did. Simply because there's cooperation between subcontractors. My client is a sub on a job site responsible for laying a foundation. So to cut to the chase, who did your client get his directions from on a daily basis? Rachel contracting the general contractor and the superintendent on the job. There was a superintendent for Rachel on the job every day. And that was testified to by Jonathan Pease and actually Jack Pease acknowledged it as well. So I think that's a, again, these are important points that I don't believe the commission addressed. And the idea of direction and control, I've already expressed my explanation of Rachel being in control of scheduling. The other element that's very important that has not been addressed by the commission is whether or not a termination or a dismissal from this job could be dispensed by my client. That's important in the case law because it demonstrates that real level of control. These both of these gentlemen who own these respective companies, Jack Pease and Jonathan Pease explained that they do not control and do not have authority over each other's My client, perhaps meaning Rock Solid, if we wanted to dismiss DRIPS, all he would have to do is call Supermix. That actually illustrates my point. I said that in my reply brief. Yes, exactly. The only way my client could ever truly dismiss Mr. DRIPS from this assignment would be to somehow call his father at Supermix and say, I don't want him driving these trucks. And even then, his dad's making money. He has an agreement with Rachel, the general contractor. So in your opinion, who was the borrowing employer or was there a borrowing? My personal opinion, and again, I take it with a grain of salt, you're the appellate court, right? I don't think it's lending borrowing. I think this is a contract with a trucking company by Rachel to deliver product to a job site, just like thousands of truckers all over the nation deliver product to their customers all the time. And who are the parties to the contract? It would be Rachel and Supermix. That is where the money was exchanged for the services of Mr. DRIPS. My client is involved in none of it. Not $1 of any cash, whether it be a brokerage deal or for services or paying for DRIPS driving was through my client at all. So did your client ever receive any directions then from Rachel? Did anybody contact him, tell him where to go, what to do, anything like that? Well, just about every day. Jonathan Pease explained that Rachel was in charge of everything. If they said it's a day off for a holiday or a half day or speed up, slow down, the superintendent at Rachel was in charge. Yes, my client relayed a request to deliver at a particular time. That is a minuscule point that again, is very much in tune, similar to facts explained in the that does not trigger an employer-employee relationship, especially where there's no financial interaction between these subcontractors. But the claimant wouldn't know where to go every day if it wasn't for Rock Solid's employees, correct? Well, you could say that, but in reality, they're not some integral part. Who made a phone call? It could be made by anybody. If Rachel decided, I'll just make the phone call today, they could. If any of three other subcontractors on that job site, Jonathan Pease said there were four or five subcontractors. If any of them decided to make that phone call or were told by Rachel to make the phone call on any given day, hey, you guys, can you leave at six in the morning and be here at four in the afternoon, whatever it may be, that doesn't trigger employer-employee relationship. Who's really representing the claimant at the original hearing? I'm sorry? Do you represent the claimant at the original arbitration hearing? No. Well, you mean the Mr. Dripps was represented by Mr. Botha. He didn't really participate in this level of appeal. So I only represented well, actually, initially the case was only against Supermix. And then my client was brought in after Supermix had been paying benefits for a while. And we were named as a borrowing employer and the fight between the respective employers ensued. And it has really been a fight between Supermix and Rock Solid ever since. There were some arguments regarding the extent of disability and things. Those have fallen by the wayside. Unfortunately, Mr. Dripps passed away, actually. So that's why it's not as relevant or part of the appeal any further. But it's really a controversy between the two insurance carriers. Yes. That's correct. We'll be honest with it. That's what we're doing. That's exactly right. There's two carriers here. It's who's going to pay. They both have the ability to pay. Supermix had paid a substantial amount. I believe my client started paying after the commission decision. But it really is a question of what is the correct finding here in the correct interpretation of facts. I think the commission failed to appreciate some of these important elements, didn't address the elements that I'm bringing up, and their conclusions are inaccurate. So when we say are their factual conclusions reasonable? Well, not if they're inaccurate. Not if you're saying my client's in control when by his own testimony, he had no control. And it was through Rachel. That's never been addressed. It really hasn't. My client could not terminate from the job site, Mr. Dripps. My client didn't ask his father for the driver through his own company. He didn't pay his father for the services. That all went through Rachel. The agreement for the per load and everything like that went through Rachel right to the father's company, which is Supermix. My client's not in that equation. I is critically important. Who paid Mr. Campbell is who paid whom? Oh, okay. I apologize. All right. Mr. Campbell, though, would you acknowledge the case law clearly says that is, you know, significant consideration, but that in and of itself does not dictate the result here. Would you agree with that? I absolutely agree. It is but one factor. However, it is a factor that was dismissed, in my opinion, by the commission as not relevant. It is relevant because it opens the door to where the contract is. And we know the second element being express or implied contract. Where is this contract? Well, my clients, of course, saying I didn't have any agreement with my dad's company. We know that there's no written contract between Rachel, the general who again, if someone is going to be named as a borrower, it would have to be Rachel. But that's where the financial agreement was for hauling services. By the way, who's unrebutted testimony for hauling the cement, which is the very nature of Mr. Drip's work? Rachel. My client is not responsible in this job for hauling concrete, hauling the cement. It's not under his contract terms what he was even supposed to be doing. There was an all hands on deck because there was a shortage. A bunch of subs were called in to bring in some trucks and Rachel paid all of them. I fail to see why my client has employer-employee relationship in a borrowing relationship being triggered simply because, yes, he made a phone call and would declare what time Rachel wanted the job to start or stop or a delivery to be made. That is not enough under the totality of facts here. And I believe an accurate assessment of the facts would demonstrate that Rachel is very similar to another case heavily relied on is the Franson case. If you're going to compare facts or parties or players, if you will, Franson would be compared to Rachel, the party responsible for hauling the concrete, paying for the truckers. And Franson, Franson paid for more truckers that he needed. That's what Rachel did. My client didn't. Are you watching your time? Oh, he still has time, Joseph. OK, I you know what? I was so wrapped up in it. I had not. There's a there's a light on in the middle. That means you still have time. OK. All right. Very good. That's the middle. I just need to have two minutes. OK. Very good. Wait till the red light goes on. OK. Thank you very much. So I'll tell you your time is up. Understood. Thank you. So, again, I will. I think I touched on the most salient points that need be there. You're at the red light there. Oh, all right. Light is on now. Your time is up. Time and reply. It was my wrap up anyway. Thank you. You have time and reply. Thank you, Mr. Egan. You may respond. Good morning, your honors. Mr. Campbell, Daniel Egan on behalf of Super Mix. The first issue I want to address that was brought up is the issue of the contract and who the contract was between. That contract is in evidence. It's in the record. And the contract was between Rachel and Rock Solid. It's not until a footnote or in the addendum that's how Super Mix is going to be paid is mentioned. And the testimony also reveals that Rock Solid, Jonathan Peace, the company that was out in South Dakota, called his father and asked for trucks to be sent out there, that he needed help, that his partner also needed help. And he asked for people and trucks to come out there. There was no negotiation between Super Mix and Rachel as to how they were to be paid. It was already set between Rock Solid and Rachel. So the issue of contract, there is no contract between Super Mix and Rachel. Mr. Egan, can you address Mr. Campbell's overarching argument? He essentially seems to be saying, hey, you know, Rock Solid has nothing to do with this. Rachel had control of everything. They directed everything. They were there. They supervised. They decided what work was to be done. Basically, Rock Solid had nothing to do with any of the work that was being performed. That was all directed and controlled by Rachel. What's your response to that? Whether or not that's accurate, and I don't think there's any evidence in the record other than the testimony by Jack Peace, the evidence, when you boil it down to David Drips, is David Drips testified he either received his instructions from Jonathan Peace, the owner of Rock Solid himself, or he received them from another Rock Solid employee. So David Drips, as far as he was concerned from the testimony and how the arbitrator and the commission concluded, David Drips took his orders from Rock Solid Stabilization. That was who he was to report to when he got to South Dakota. That was who was going to give him his day-to-day orders. So whether or not Rachel controlled the overall picture, I don't think is a relevant point to this. David Drips took his day-to-day instruction from Rock Solid. That's who he reported to. Were there supervisors from any company on the job site? From any company? Well, I assume there were people from Rachel that were there. Certainly the owner of Rock Solid was there. There was nobody from Supermix, from my client, who was present in a supervisory capacity. You know, it's not clear to me how many Supermix employees were really out there. We know definitely that there were two employees with trucks. There was some testimony that there was a third truck out there for Supermix that was either driven by another Supermix employee or by a Rock Solid employee. I'm not entirely certain. Did Rock Solid have any supervisors on the job sites while Drips was working there? Did Rock Solid? Absolutely. Can I ask a question? What was the subject matter of the contract between Rachel and Rock Solid? What was Rock Solid supposed to do pursuant to that contract? Contract? On the record, what does it say? I believe that they were responsible for, and I guess Mr. Campbell can correct me if I'm wrong, they were performing some type of ground stabilization or underlayment activity of a massive road construction site. Part of that involved the spreading of concrete and the, I think gypsum is probably the wrong word. I'm not sure if I have the right terminology, but part of it was spreading the materials. Aggregate. So are we talking, Mr. Egan, are you addressing the question of what the contract was between Rachel and Rock Solid? Because I don't think there was a contract between Rock Solid and Supermix, was there? There was no contract between Rachel. I'm sorry, can you repeat your question? Yeah, I think Justice Hoffman's question can only go to one contract that's in the record, and that's between what, Rachel and Rock Solid? That's correct. Okay, because there's no contract, explicit or written contract, rather, between Supermix and Rock Solid. That's correct. That's correct. And the only mention of how Supermix was to be paid is, like I said, either in a footnote or in an addendum to that contract between Rachel and Rock Solid, and what Supermix was to haul. And they're the only one that is specifically mentioned in that contract. There are other people that were hauling, I agree, but Supermix was the only one that was mentioned in the contract. Is it your contention that at the time of his injury, the claimant was discharging obligations of Rock Solid under that contract? It is my contention. And what's your evidence to support that contention? Rock Solid had the contract to provide this underlayment, and if you read that contract, as I recall, they are to spread the materials that were brought to the job site. That contract is only between Rock Solid and Rachel, but it includes specifically Supermix as to bringing the concrete to Rock Solid. The concrete was then transferred to a Rock Solid truck and was spread. We couldn't spread it. Supermix couldn't spread that at the job site. Supermix was... I believe, and I'd have to look more deeply into the contract again, I believe that Rock Solid also had some obligation to get the concrete to the job site to spread it. I believe, and I could be wrong. I'd have to delve back into the details of the contract. Well, as a matter of law, what has to be established to find that anyone from Supermix was a borrowed employee of... Well, there are two prongs, and that's the A.J. Johnson case. The first is contract of employment, either express or implied, and the other one is control over the borrowed employee. We've talked a lot about control here, and the opponent says that the facts there won't support that. What about the contract? Well, again, as the testimony of record indicates, David Drips was approached by his dispatcher at Supermix and said, we would like for you to go to South Dakota, and we would like for you to report to Jonathan Peace of Rock Solid Stabilization and do whatever it is Jonathan asks you to do at the job site. And David Drips got in his Supermix truck, testified he followed other Rock Solid employees from Illinois to South Dakota, stayed at a hotel with other Rock Solid employees, and reported to Jonathan Peace to take his day-to-day orders and obligations. If that's not understanding that there's an implied contract of hire or employer-employee relationship, I don't know what else needs to be shown. And I think the commission made the same conclusion, and I think there is plenty of evidence to support those factual determinations and the conclusion by the commission. Well, it isn't an employee-employee relationship. We're in borrowed employee. Clearly, he's an employee of Supermix, am I correct? We don't dispute that we're jointly and severally liable. But he was sent, he was asked to go to, or he volunteered. Wasn't the issue whether or not he was a borrowed employee, and if so, the law says a borrowed employee looks to the borrower, is that correct? That's correct. Okay. I think, I think... No, we're really not talking about employer-employee. We're talking about... We're talking about lending and borrowing. That's right. Right. You know, I know, I know what Justice Hoffman said about the circuit court decision in this of the commission is not against the manifest way to the evidence. The circuit court indicated that the arbitrator determined that RockSolid had the right to control the manner in which the employee performed the work, and he went through those factual bases. And it's clear that to the court that there was evidence that RockSolid directed the employee on how to, that RockSolid directed and controlled the work of Mr. Dripps, exercised all the direction and control of Mr. Dripps at the work site, and that Mr. Dripps was dependent on receiving direction from RockSolid. I think those are all reasonable conclusions based upon the evidence of record here before your honors. I believe that... Well, we don't care whether the circuit court thinks the reason... I understand... Whether or not the conclusions reached by the commission were... Well, I understand that. As I indicate, I think the circuit court put it very succinctly and eloquently, and I can't do a better job of summarizing that this is a reasonable decision, not against the manifest way to the evidence, nor is it contrary to law. You can just plagiarize the circuit court. Running for president, I've been known to do that. Yeah, well, lawyers do that very well. We find something that works. And I want to give credit to Judge Meyer because he's the one who wrote it. I did not. He said it very well, and I would agree with what he stated. Golly, Ned, you'll never run for president doing that. You know what? I have enough difficulty doing what I'm doing. And presidency is nowhere on the horizon. But at any rate, the commission decision is a reasonable one. There's plenty of facts to... Well, our standard isn't reasonableness on review. No, there's no... But there are plenty of facts of record to support that this decision is not against the manifest weight of the evidence and that it should be affirmed. Okay. Thank you, Mr. Egan. I thank you all. It's nice to see you all. I hope you're all well, including Mr. Campbell. Thank you, Dan. Appreciate it. Mr. Campbell, you may reply now. Mr. Egan, I do wish you well also, despite... Despite the adversarial nature of this proceeding. Exactly. I think we've gotten along very well despite the adversarial nature. I would agree. I would agree. So, if I may, your honors, and thank you, Mr. Egan. The one question that was asked during Mr. Egan's time was whether or not Mr. Dripps, the petitioner in this case, was discharging obligations of rock solid. And I know Mr. Egan said, maybe I'm not sure. I think so. He wasn't sure. I am certain that the record reflects that he was not. Both by the testimony of Jonathan Pease, my client, who made clear that he was not responsible for purchasing or delivering the cement on this job. The contract also indicates GCC is the subcontractor responsible for delivering the cement. So, that is the answer to that, what I think is a very good and important question. And I couldn't have asked it better myself. And well, I didn't. I'm glad the justices did. It is important. He was not discharging obligations that were my client's responsibility. And that is undisputed based on Jonathan Pease testimony and the very contract with Rachel between my client. He was only responsible on the job site for work for spreading. Mr. Egan points out why then, I'm sure you will all ask, are there rock solid drivers also hauling cement then, Mr. Campbell, right? You said they're not responsible. If you hear the full testimony of my client, Jonathan Pease, he explains that the sub that Rachel hired, GCC, had insufficient number of trucks. So, it was all hands on deck. Well, Rachel needs more trucks to fulfill this aspect of the job. So, Rachel can do their job. I'm sorry. My client, rock solid, can do their job on the job site. My client did have two extra trucks. He said, I've got some guys. That's why my client called his father. He said, hey, there's a shortage. GCC is responsible for this. They don't have enough. Rachel paid Supermix for more trucks and more. We don't have the names of the other subs, but more subcontractors. There were several subcontractor trucking companies that Rachel paid to support the full need to deliver these goods. It was not part of my client's job. What Mr. Dripps was performing was over the road truck driving and hauling for his direct employer. And if anyone is a borrowing employer here, it would have to be Rachel. My client is not in this equation, did not make any, certainly no written, we know that, or implied or verbal agreement financially with his father at all for Mr. Dripps services. It was all through Rachel. That's very important. So, you're characterizing Supermix, or you're characterizing your client, rock solid, as in this situation, just basically a broker. I'm afraid of calling it that at all, because a broker makes money, Your Honor. If my client took a fee off of this or charged Rachel and then took his dad's workers and put them in his trucks and was making money, different facts here. This is a- Okay, so if you don't, if you're claiming that a broker is only a broker if they take a fee, which I might argue with, he's basically then referred, you're characterizing this as a referral to Rachel of his daddy's company, Supermix, in Illinois. I, it is a referral. I guess that's a better way to put it. I don't like the word broker because it imparts that my client has a hand in the agreement for the services. He does not have a hand in the agreement for services at all, either express or implied. I believe that's critically important. I asked this court to read the full breadth of that, and I see I'm out of time. My final point- No, you're not out of time. Oh, I thought I was. Just the president is mistaken. You're in a warning position. Oh, I see. Okay. I just wanted to give you a personal warning. It's the light that's red. I'm sorry. Thank you. You can enter the intersection, Mr. Campbell. All right. I'm closing in. All right. The final point, and I think this has been lost by the commission, and I don't want it to be lost in today's discussion. This idea of supervision and control, again, Mr. Dripps did no work on this job site. And the idea that he was directed or controlled on the job site, we use that term because it's in case law, it is a red herring, and it's a square peg into a round hole if you're trying to equate an over-the-road driver, who's in charge of delivering product to a customer, to a job site. Mr. Dripps did no work on the job site, where my client did have a supervisor, of course, Jonathan Pease. The owner was on the job site. But he did not direct or control any of his work. We certainly don't control a trucker when they're driving over the road. This injury happened hundreds of miles from that job site. I ask this court to please consider the full breadth of facts and reverse the inaccurate and improper decision of the commission. Thank you. Thank you, Mr. Campbell. Thank you, Mr. Egan. Thank you all.